ELLIOTT J. WILLIAMS, Bar No. 144835
elliott.williams@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380
Facsimile:  503.220.2480
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JOAN SCHRADER and SPECIALTY FAMILY HOMES, LLC, | Case No.: 3:22-cv-00945-JR |
| Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| STATE OF OREGON, FARIBORZ PAKSERESHT, in his official and individual capacity, LILIA TENINTY, in her official and individual capacity, and CHELAS KRONENBERG, in her official and individual capacity., | |
| Defendants. | |

PLAINTIFFS Specialty Family Homes, LLC (hereafter, SFH) and Joan Schrader

(Schrader), SFH's sole member, hereby allege as follows:

## I.    INTRODUCTION

1.

This case challenges a longstanding practice of the Office of Developmental Disabilities Services (ODDS) of Oregon's Department of Human Services (DHS). The Oregon Assessments System, as described and defined below, restricts the amount of care and support provided to disabled individuals by reason of their disability by denying high-needs I/DD individuals the support that is necessary for them to live in the manner they choose to live, as set forth in their Individual Service Plans ("ISP"). The Assessments System has denied support and services including necessary hours of attendant care services for high-needs I/DD individuals and including the freedom to choose to live in a nonresidential Provider Setting, which for high-needs individuals may be the only practical solution for living independently.

2.

These restrictions are not imposed on individuals who are less disabled than the high-needs I/DD individuals that Plaintiffs serve. Therefore, the restrictions imposed by the Assessments System are imposed *on account of the individual's disability* and constituted discrimination on the basis of disability.

3.

In 2019, when ODDS retaliated against Plaintiffs for advocating for a disabled individual who was hospitalized after ODDS failed to provide supportive nursing care that was required in the individual's ISP. The purported rationale for ODDS's retaliation against Plaintiffs, preventing so-called "unlicensed foster care," mischaracterizes the *nonresidential* context in which Plaintiffs deliver services. In *nonresidential settings*, individuals maintain the right to

choose the individual's room, board, and support service providers, as opposed to foster care or 24-hour residential care settings where they do not maintain these rights.

4.

Instead of protecting the individual's choice, the Assessments System *removes* the individual's freedom to make independent choices and acts *contrary* to ODDS's statutory mandate, including ORS 427.121, and contrary to the federal laws. Federal Due Process and the ADA's Integration Mandate require that ODDS respect the individual's rights of privacy, dignity, and respect, and freedom from coercion and restraint, including rights of association, in choosing where and with whom to live. Defendants' application of the Assessments System to the high-needs I/DD individuals served by Plaintiffs is arbitrary and capricious, discriminatory, retaliatory, and void.

## II.    PARTIES

5.

Plaintiff Schrader provides care to disabled individuals through her company, SFH. This care is provided by Plaintiffs in a community setting within the District of Oregon, and Plaintiffs are endorsed to provide Community Living Supports, hourly attendant care services, and 24-hour residential care programs.

6.

The State of Oregon accepts and administers federal Medicaid funding for disability programs through its DHS. The State of Oregon also accepts federal funds from programs administered under the Fair Housing Act. At all times material to this complaint, Defendant State of Oregon is a government organization operating in the District of Oregon, Defendant Fariborz Pakseresht (hereafter, 'Defendant Pakseresht') has been an employee of Defendant State of

Oregon, working as the director of Oregon's Department of Human Services, Defendant Lilia

Teninty (hereafter, 'Defendant Teninty') has been an employee of Defendant State of Oregon,

working as the director of the Office of Developmental Disabilities Services, and Defendant

Chelas Kronenberg has been an employee of Defendant State of Oregon, working as a Policy

Manager in the Office of Developmental Disabilities Services. Plaintiff Joan Schrader is the sole

owner of Specialty Family Homes, LLC (hereafter, 'SFH'), an agency certified by the Oregon

Department of Human services to provide attendant care for individuals with intellectual and

developmental disabilities. SFH employs approximately thirty attendant care staff who provide

attendant care in homes and community settings within the District of Oregon. Plaintiffs are

endorsed to provide hourly attendant care through the community living supports program, and

24-hour residential care services.

### III.    JURISDICTION AND VENUE

7.

The events giving rise to this complaint occurred in this District. This Court has original

jurisdiction of the federal claims contained in this complaint pursuant to 28 U.S.C. § 1331.

Venue is proper in the United States District Court, District of Oregon, Portland Division,

because the events giving rise to Plaintiffs' claims took place within this District.

### IV.    FACTUAL BACKGROUND

### A.    Oregon's Programs for Individuals with Developmental Disabilities

8.

The State of Oregon accepts and administers federal Medicaid funding for disability pro-

grams through its Department of Human Services and Office of Developmental Disability Ser-

vices. The State of Oregon also accepts federal funds from programs administered under the Fair Housing Act.

9.

The 'Community First Choice Medicaid Program' is a federal program authorized under 42 U.S.C. 1396n(k) (known in Oregon as the 'Oregon K Plan'). The "Community First Choice" (CFC) option went into effect October 2011 and is one of four options introduced or amended in the Affordable Care Act to provide long-term services and supports (LTSS) to individuals in their homes or communities rather than in institutional settings. All of these options reflect the goal of rebalancing Medicaid spending on LTSS to encourage a person-centered, long-term support system and to give LTSS beneficiaries the opportunity to decide where they live and have greater control over the services they receive.

10.

The Community First Choice benefit increases states' Federal Medical Assistance Percentage' (FMAP) by six percentage points for covered home and community-based services and supports (HCBS) provided through the state plan to Medicaid enrollees who require an institutional level of care. Covered services include attendant services and supports intended to support enrollee input and control over the services they receive. Specifically, CFC covers:

- Assistance with activities of daily living (ADLs), instrumental activities of daily living (IADLs) and health-related tasks through hands-on assistance, supervision, and/ or cuing;

- The acquisition, maintenance, and enhancement of skills necessary to accomplish ADLs, IADLs, and health-related tasks;

- Backup systems or mechanisms to ensure continuity of services and supports;

- Support system activities (such as needs assessment, assessment counseling, risk assessment and management, and person-centered service planning);
- Voluntary training on selecting, managing, and dismissing attendants and activities of daily living.

11.

Participation in the Community First Choice Medicaid Program requires that states provide services to disabled individuals, "in the most integrated setting appropriate to the individual's needs, and without regard to the individual's age, type or nature of disability, severity of disability [emphasis added], or the form of home and community-based attendant services and supports that the individual requires in order to lead an independent life." 42 USC. 1396n(k)(3)(B).

12.

One of the requirements imposed on the States through Medicaid is that "[a] State plan for medical assistance must . . . (23) provide that (A) any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23). This provision—known as Medicaid's "free-choice-of-provider requirement"—protects the right of the individual to obtain assistance from any person qualified to provide such services. *See Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2003).

13.

In the Rehabilitation Act of 1973, Congress stated, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (1976). In the Americans with Disabilities Act, enacted in 1990, Congress required all public entities to refrain from discrimination, *see* 42 U.S.C. § 12132, and explicitly identified unjustified "segregation" of persons with disabilities as a "for[m] of discrimination," *id.* § 12101(a)(2) ("historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"); *id.* § 12101(a)(5) ("individuals with disabilities continually encounter various forms of discrimination, including . . . segregation"); *see also* 28 C.F.R. § 35.130(d) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.").

14.

Interpreting the above statutes in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the Supreme Court affirmed a decision that the State of Georgia had discriminated against individuals with developmental disabilities in violation of federal law by declining to move them from an institutional setting to a community-based setting upon a showing that the individuals were qualified for a community-based setting. This "**Integration Mandate**" "serves one of the principal purposes of Title II of the ADA: ending the isolation and segregation of disabled persons." *Arc of Wash. State, Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005); *see also*

*Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003) (ruling that a state's failure to provide services to a qualified person in a community-based setting as opposed to a nursing home presents a violation of Title II of the ADA).

15.

In order to determine a disabled individual's needs, the State of Oregon (working with other local government agencies) develops an 'Individual Support Plan' ('ISP') for that individual. This is a comprehensive process required by Community First Choice statutes (42 U.S.C. 1396n(k)(1)(A)(i)) and Oregon statutes (ORS 427.107(2)(j)) that produces a detailed assessment of the level of care an individual will require with specific protocols, safety plans, descriptions of nursing tasks, behavior support plans, and other instructions that attendant caregivers must follow to maintain the individual's health and safety. The ISP will also determine how many hours of care a disabled individual needs. Depending on the nature of the disability, this can be anywhere between a few hours of care per month, up to 48 hours (or more) of care per day for extremely disabled individuals (requiring more than one around-the-clock caregiver each day).

16.

An ISP also contains an agreement between the State of Oregon and individual service providers, in which the State of Oregon agrees to pay the provider for the ISP services delivered to disabled individuals.

**ASSESSMENTS SYSTEM RESTRICTS AMOUNT OF CARE**

17.

Separate from the development of an individual's ISP, the State of Oregon uses assessment tools which produce a monthly rate for individuals in residential care, or a number of

hours of attendant care in the community living supports program. Upon information and belief, these assessments were created before the Community First Choice Program was implemented in 2013. These service level assessments are out of compliance with the Americans with Disabilities Act because they contain arbitrary caps on the amount of care hours individuals may require in their authorized ISP. For example:

- Oregon's 'Adult Needs Assessment' measures a maximum of 23.86 hours of care per day.

- Oregon's 'Support Intensity Scale' measures a maximum of approximately 12 hours of care per day.

- The 'Oregon Needs Assessment' measures up to 16.7 hours of care per day.

These assessments (together, the Oregon "Assessments System") will identify that a person needs assistance with activities of daily living ("ADLs"), instrumental activities of daily living ("IADLs") and health-related tasks but, unlike an ISP, the assessment cannot actually detail the amount of care a person will need to address these issues.

18.

Through the use of these assessments, the State of Oregon limits recipients to the maximum amount of care dictated by these assessments, regardless of the disabled individual's actual needs as determined by their ISP. This denies them the full benefits authorized by their Individual Support Plan. If an individual needs more care than what is authorized by these assessments, they can request a review by an 'Exception Committee', but this process is discriminatory against severely disabled persons because:

- Individuals with less severe disabilities do not have to go through this appeal process.

- 42 USC 1396n(k)(3)(B) requires the State of Oregon to provide care, regardless of the severity of an individual's disability.

- This denies severely disabled individuals the same opportunity to participate in the Community First Choice Program as those will less severe disabilities.

- There is no right to a fair hearing, as required by the U.S. Constitution and Federal Medicaid law 42 U.S.C. § 1396a(a)(3)

- The Exception Committee will only review documents. There is no hearing before an independent tribunal with a right to interview witnesses.

19.

Defendants Assessment System, on its face or as applied, fails to notify certain individuals that the Assessment System is being used to restrict access to attendant care hours in the individuals ISP. On information and belief, Defendants do not provide notice to individuals in certain residential settings if the Assessment System provides for a fewer number of hours than the individual's ISP. Accordingly, the individual in such a setting does not receive notice or an opportunity to be heard in the matter of the reduction of hours of attendant care. Plaintiff Schrader migrated from providing residential care as a Foster Home and later as a Group Home to providing nonresidential care in the Community Living Supports program, in part because ODDS did not provide notice to the high-needs individuals in Schrader's care regarding the use of the Assessment System to reduce the attendant care hours that ODDS intended to provide. Plaintiffs would consider returning to a residential care but for the systemic practice and/or policy of ODDS not to provide notice or opportunity to be heard to individuals in residential system ("Failure to Notify Policy") in connection insufficient attendant care based on the Assessments System.

20.

Regardless of the number of hours produced by the assessment, providers of disability services are legally required to provide the hours of care needed for an individual as determined by their ISP. This is true even though the State of Oregon will not reimburse the providers for these services. If the provider cannot deliver the individual's ISP services, then the provider must exit the individual from the provider's program or close the program, regardless of whether or not that individual has alternative housing or services.

21.

By refusing to provide disabled individuals with the amount of care needed in their ISP to accomplish activities of daily living, instrumental activities of daily living and health-related tasks, Defendants have violated 42 U.S.C. 1396n(k) (which requires the State of Oregon to provide care, regardless of the severity of an individual's disability), 42 USC 12132, and 29 USC 794a. This discrimination constitutes an ongoing systemic pattern or practice of behavior that dates back to at least 2011. Plaintiffs are persons aggrieved by this discrimination.

## ASSESSMENTS SYSTEM RESTRICTS HOUSING SELECTION

22.

The Fair Housing Act (FHA) requires reasonable accommodations be made to rules, policies, practices, or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. Allowing disabled individuals to reside with their caregivers is a reasonable accommodation under the FHA.

23.

The FHA (42 USC 3604(f)(2)(B)) also prohibits discrimination against any person in the terms, conditions, or privileges of the rental of a dwelling or provision of services in connection

with such dwelling because of a handicap of a person residing in or intending to reside in that dwelling.

24.

In 2022, Defendants finalized new administrative rules that have a major adverse impact on where severely disabled individuals are allowed to live. Currently, Plaintiffs provide community living supports to AM, TH, WR, CW, and CM, five disabled individuals who all currently reside with one of their caregivers. However, the newly finalized rules make this type of living arrangement unlawful.

25.

In or about October 2022, Defendants proposed an administrative rule for nonresidential settings to create a new category of settings ("provider-owned") in the Community Living Supports program in which an I/DD individual could not receive attendant care services (Proposed Rule). This category of setting has no predicate in federal policies or in the policies of the State of Oregon. Instead, prohibiting attendant care services in a provider-owned setting mimics the licensing violation issued by ODDS against SFH in response to Schrader's advocacy for AMC in 2019.

26.

Defendants did not give notice of their intended action of adopting the Proposed Rule to persons who had requested notice of ODDS's intended actions pursuant to ORS 183.335(c). Schrader had requested electronic notice of ODDS's intended actions, and had received such notices regularly in the past, but received no such notice of the Proposed Rule. Nor did Defendants provide notice of their intended action of adopting the Proposed Rule in the manner established by rule adopted by the agency to provide a reasonable opportunity for interested

persons to be notified of the agency's proposed action, pursuant to ORS 183.335(1)(a). Schrader

had previously reviewed notices of ODDS's intended actions on the ODDS Rules website, *e.g.,*

https://www.oregon.gov/odhs/rules-policy/pages/odds-rules.aspx. However, Defendants did not

provide notice of the Proposed Rule on the ODDS Rules website.

27.

Around December 20, 2022, Defendants made final the Proposed Rule in OAR 411-450

("Final Rule").

28.

Specifically, the Final Rule defined a "provider-owned dwelling," "provider-rented

dwelling," and "provider owned, controlled, or operated setting" (together, Provider Setting)

which an individual may not choose in order to be eligible for Community Living Supports:

> (6) SETTING LIMITATIONS.
>
> (a) An individual may receive community living supports if
> the individual:
>
> (A) Resides in a setting the individual owns, leases, or rents
> or is on the property deed, mortgage, or title.
>
> (B) Resides in a setting, either through an informal
> arrangement or rental agreement, owned, leased, or rented by a
> family member.
>
> (C) Has no permanent residence.
>
> (b) An individual is *not eligible* for community living
> supports, other than DSA, if the individual resides in one of the
> following:
>
> (A) A provider-owned dwelling or a provider-rented
> dwelling through an informal or formal agreement.
>
> (B) A provider owned, controlled, or operated setting.

OAR 411-450-0060(6) (emphasis added).

(24) "Provider-Owned Dwelling" means a dwelling that is owned by a provider or the provider's spouse, when the provider is proposing to be paid for delivering home and community-based services to an individual, and the provider or the provider's spouse is not related to the individual by blood, marriage, or adoption. A provider-owned dwelling includes, but is not limited to:

(a) A house, apartment, and condominium.

(b) A portion of a house, such as a basement or a garage, even when remodeled to be used as a separate dwelling.

(c) A trailer and mobile home.

(d) A duplex unless the structure displays a separate address from the other residential unit and was originally built as a duplex.

(25) "Provider-Rented Dwelling" means a dwelling that is rented or leased by a provider or the provider's spouse, when the provider is proposing to be paid for delivering home and community-based services to an individual, and the provider or the provider's spouse is not related to the individual by blood, marriage, or adoption.

OAR 411-450-0000(24), (25).

The last sentence of OAR 411-450-0060(6), which further restricts housing choices, was added to the rule after Plaintiffs commented on the rule and after Plaintiffs communicated with Defendants that the rule could put Plaintiffs out of business because all of Plaintiff's clients share housing with a caregiver employed by SFH.

29.

By excluding the newly defined Provider Settings from the Community Living Supports program, the Final Rule prohibits I/DD individuals from choosing to receive support services from an agency for whom the individual's landlord or landlord's spouse works. The Final Rule also prohibits I/DD individuals from choosing to live with an owner, owner's spouse, employee, or employee's spouse of an agency from whom the individual receives support services.

30.

Non-disabled individuals and disabled individuals who do not need high levels of community-based care have no such restrictions and can live where they please. This rule is already in effect and will destroy Plaintiffs' business operations. Plaintiffs will no longer be able to provide community living supports to severely disabled individuals if this rule is allowed to remain in effect. In addition, to continue to receive attendant care services from their experienced SFH staff, it would force these individuals into homelessness, because Defendants make them ineligible for their SFH services based on where they live. Plaintiffs are currently seeking a temporary and permanent injunction preventing this rule from taking effect (see case no. 3:22-cv-01957).

31.

In September of 2019, Plaintiff Schrader informed Defendant Kronenberg that the state's failure to provide nursing care to one of the disabled people SFH provides care for (known as AMC, see below) constituted abuse of a disabled person. The very next day, Defendant Kronenberg stopped ALL payments to SFH related to AMC's care and ODDS issued Plaintiff Schrader a licensing violation. The licensing violation claimed that because AMC lived in the Schrader home, Plaintiff Schrader was not providing hourly attendant care in the Community Living Supports program but was providing "unlicensed foster care". The licensing violation did not make it clear how SFH's provision of hourly attendant care to AMC in the Community Living Supports program while AMC lived with the Schrader family could be construed as "unlicensed foster care". Foster care is a residential service as opposed to Community Living Supports which is an hourly service so it appeared that ODDS was applying a residential rule, the foster care rule, to a non-residential program, the Community Living Supports program.

Upon information and belief, Defendant Kronenberg's decision to stop these payments and the issuance of the ODDS licensing violation was due to Plaintiff Schrader making these complaints of abuse. Defendant Kronenberg and Defendant Teninty ordered payment stopped just prior to the issuance of the licensing violation.

32.

Upon information and belief, the promulgation of the rule described in Paragraph 14, above, was motivated in whole or in part by the desire to shut down Plaintiffs' business of caring for severely disabled individuals. Upon information and belief, Defendants wanted to shut Plaintiff's business down because she advocated on the behalf of disabled individuals to receive their care according to their ISPs.

## <u>HARM DONE TO DISABLED INDIVIDUALS AND PLAINTIFFS</u>

33.

Defendants' violations of the Americans with Disabilities Act, Rehabilitation Act, Fair Housing Act, and other Federal statutes have harmed Plaintiffs and the disabled people they care for. Each of the people listed in paragraphs 19-25 below have had their rights violated in one or more of the following ways:

- They have been denied the care authorized in their ISPs for which they are entitled to under the ADA and the Community First Choice Medicaid Program/Oregon K Plan. Plaintiffs have provided this care, but have not been compensated for it by Defendants.

- They have not received a notice for reductions of the services they are entitled to under their ISP, in violation of 42 U.S.C. § 1396a(a)(3), 42 C.F.R. § 431.206, and ORS 427.107(2)(m).

- They have not received prompt services in the form of the care they are legally entitled to receive, in violation of 42 U.S.C. § 1396a(a)(8).

- They have not received a fair hearing on these issues, in violation of 42 U.S.C. § 1396a(a)(3), 42 C.F.R. § 431.206, and ORS 427.107(2)(m).

- They are denied the use and enjoyment of a dwelling in violation of the Fair Housing Act (42 USC 3604) and ORS 427.121(2).

The ADA requires that disabled individuals be allowed access to government services and programs (42 USC 12132). Thus, if disabled individuals are denied access to services for which they are entitled under Federal Medicaid programs (such as the Oregon K Plan), such denials of access constitute discrimination, a violation of the ADA.

Plaintiffs have been harmed by these discriminatory actions towards these individuals because they have not received the amount of compensation they are legally entitled to for providing care to these individuals. If Defendants had delivered the care required under these individuals' ISPs, Plaintiffs would have received the proper amount of compensation. All of this discrimination has been part of the ongoing systemic policies and practices that continue through to the present day. But for the discriminatory actions of Defendants', Plaintiffs would not have incurred this harm.

## AM - <u>Authorized ISP Services Inaccessible to AM</u>

34.

AM is an individual who is entitled to receive 213 hours of care per week as determined by his current ISP. Between 11/17/11 thru 5/10/15, AM was entitled to, but could not access 15,252 hours of his ISP attendant care services. Because AM could not access his ISP attendant care services, Defendants denied Plaintiffs payment for 15,252 hours of ISP care that Defendants required Plaintiffs to deliver. Defendants required and continue to require Plaintiff SFH to deliver care according to AM's ISP or face abuse allegations and licensing violations. This type of systemic discrimination continues through the present in DHS's 24-hour residential programs. The compensation Plaintiff SFH should have received for delivering AM's ISP attendant care shall be determined at trial, but shall not exceed $750,000.

35.

**No Notice Provided to Contest the Reduction and Denial of AM's Services**

In 2011, AM's ISP authorized 26 hours of care per day (one person around the clock and a second person for 2 hours each morning). However, Defendants only approved AM for 12 hours of care per day. AM never had an opportunity to contest the reduction and denial of his services because he never received any notice from DHS or ODDS regarding this denial of over half of his authorized ISP services.

36.

**AM Denied Prompt Services**

From 11/17/11 thru 5/10/15, AM waited for DHS to deliver his ISP services authorized by DHS. This extraordinary delay is a violation of 42 U.S.C. § 1396a(a)(8), which requires Medicaid services to be delivered promptly.

37.

**AM Denied a Fair Hearing**

AM never received notice to access a fair hearing regarding the denial in services that

occurred in 2011 (the difference between the hours of care in his authorized ISP vs. hours of care

for which DHS made him eligible). This type of systemic discrimination continues through the

present. AM was never offered notice that he was entitled to a fair hearing and he was not

allowed to submit evidence or interview witnesses.

38.

**AM's Rights Under the Fair Housing Act Are Violated**

AM currently lives with one of his caregivers. OAR 411-450-0060(6) denies AM the

right to live in and enjoy this dwelling of his choice. 42 USC 3604(f)(2)(B) prohibits

discrimination against any person in the terms, conditions, or privileges of the rental of a

dwelling or provision of services in connection with such dwelling because of a handicap of a

person residing in or intending to reside in that dwelling. The implementation of OAR 411-450-

0060(6) violated this Federal statute and forces AM to move out of his current home to receive

his community living support services from SFH.

**TH - Authorized ISP Services Inaccessible to TH**

39.

TH is an individual who is entitled to receive 210 hours of care per week as determined

by his current ISP. Between 10/29/13 thru 5/10/15 TH could not access 8,329 hours of his ISP

attendant care services. Because TH could not access his ISP attendant care services, Defendants

denied Plaintiffs payment for 8,329 hours of ISP care that Defendants required Plaintiff to

deliver. Defendants required and continue to require Plaintiff SFH to deliver care according to

TH's ISP or face abuse allegations and licensing violations. This type of systemic discrimination continues through the present in DHS's 24-hour residential programs. The additional compensation Plaintiff SFH should have received for this individual shall be determined at trial but shall not exceed $450,000.

40.

**No Notice Provided to Contest the Reduction and Denial of TH's Services**

In 2014, TH's ISP authorized 25 hours of care per day, however, Defendants only delivered at times 7 hours and at other times 10 hours of care per day to TH. TH did not have an opportunity to access a fair hearing because he never received any notice from DHS or ODDS regarding reductions in TH's services and denials of TH's services.

41.

**TH Denied Prompt Services**

From 10/29/13 thru 5/10/15, TH waited for DHS to deliver his ISP services authorized by DHS. This extraordinary delay is a violation of 42 U.S.C. § 1396a(a)(8), which requires Medicaid services to be delivered promptly.

42.

**TH Denied a Fair Hearing**

TH never received notice to access a fair hearing regarding the reduction in his services that occurred in 2013 (the difference between the hours of care in his authorized ISP vs. hours of care for which DHS made him eligible). This type of systemic discrimination continues through the present. TH was never offered notice that he was entitled to a fair hearing and he was not allowed to submit evidence or interview witnesses.

43.

**TH's Rights Under the Fair Housing Act Are Violated**

TH currently lives with Plaintiff Schrader. OAR 411-450-0060(6) denies TH the right to live where he chooses. 42 USC 3604(f)(2)(B) prohibits discrimination against any person in the terms, conditions, or privileges of the rental of a dwelling or provision of services in connection with such dwelling because of a handicap of a person residing in or intending to reside in that dwelling. The implementation of OAR 411-450-0060(6) violates this Federal statute and forces TH to move out of his current home to receive community living support services from SFH.

44.

**WR**

**Authorized ISP Services Inaccessible to WR**

WR is an individual who is entitled to receive 280 hours of care per week as determined by his ISP. Between 8/7/16 thru the present WR could not access 5,804.16 hours of his ISP attendant care services. Because WR could not access his attendant care services, Defendants denied Plaintiffs payment for 5,804.16 hours of ISP care that Defendants required Plaintiff to deliver. Defendants required and continue to require Plaintiff SFH to deliver care according to WR's ISP or face abuse allegations and licensing violations. The compensation Plaintiff SFH should have received for delivering WR's ISP attendant care (including future compensation) shall be determined at trial but shall not exceed $300,000.

45.

**No Notice Provided to Contest the Reduction and Denial of WR's Services**

In 2016, WR's ISP authorized 40 hours of attendant care per day (two attendant caregivers for 16 hours per day and one caregiver for 8 hours during the night). However,

Defendants only approved WR for 29 hours of care per day. WR never received any notice from

DHS or ODDS about this reduction in his services and the denial of his ISP services.

46.

**WR Denied Prompt Services**

From 2016 to about July 2023, with the exception of a few months in 2020, WR has

waited for DHS to deliver his ISP services authorized by DHS. This extraordinary delay is a

violation of 42 U.S.C. § 1396a(a)(8), which requires Medicaid services to be delivered promptly.

47.

**WR's Rights Under the Fair Housing Act Are Violated**

WR currently lives with Plaintiff Schrader. OAR 411-450-0060(6) denies WR the right to

live in and enjoy this dwelling of his choice. 42 USC 3604(f)(2)(B) prohibits discrimination

against any person in the terms, conditions, or privileges of the rental of a dwelling or provision

of services in connection with such dwelling because of a handicap of a person residing in or

intending to reside in that dwelling. The implementation of OAR 411-450-0060(6) violated this

Federal statute and forces WR to move out of his current home to receive his community living

support services from SFH.


**AMC- Authorized ISP Services Inaccessible to AMC**

48.

AMC is an individual who needed 376 hours of care per week as determined by her ISP.

Between 3/8/19 thru 9/23/21, AMC could not access 12,193.64 hours of her ISP attendant care

services. Because AMC could not access her ISP attendant care services, Defendants denied

Plaintiffs payment for 12,193.64 hours of ISP care that Defendants required Plaintiff to deliver.

Defendants required Plaintiff SFH to deliver care according to AMC's ISP or face abuse

allegations and licensing violations. The compensation Plaintiff SFH should have received for

delivering AMC's ISP attendant care shall be determined at trial, but shall not exceed $500,000.

49.

**No Notice Provided to Contest the Reduction and Denial of AMC's Services**

Existing a residential setting in 2019, AMC's ISP indicated she needed 53.7 hours of

attendant care per day. However, upon entrance into the community living support program

Defendants initially only approved AMC for 26.83 hours of care per day. AMC never received

any notice from DHS or ODDS regarding this reduction in her ISP services. Defendants

continued to deny AMC's necessary services documented her ISP until the day she died.

50.

**AMC Denied Prompt Services**

From March 8, 2019 to her death in September of 2021, AMC was unable to access the

ISP services authorized in her ISP. This extraordinary delay is a violation of 42 U.S.C.

§ 1396a(a)(8), which requires Medicaid services to be delivered promptly.

51.

**No Meaningful Access to a Fair Hearing for AMC**

AMC was not allowed a fair hearing regarding the reduction in services that occurred in

2019 (the difference between the hours of care in her authorized ISPs vs. hours of care for which

DHS made her eligible) when she entered the community living support program.

52.

**AMC Denied a Reasonable Accommodation**

In September of 2019, AMC was hospitalized for a few days. However, ODDS stopped payment to Plaintiff SFH for AMC's care at this time (see paragraph 16, above) and AMC could not leave the hospital because she no longer had a home to go to. ODDS stopped payment because of alleged licensing violations based on the fact that Plaintiff Schrader owned her private home and shared the home with AMC. Plaintiff Schrader moved out of her home and rented a duplex to comply with the licensing violation order, but because Plaintiff Schrader and her husband still owned the home AMC was residing in, ODDS did not count this as sufficient to correct the alleged licensing violation. Plaintiff Schrader and her husband removed their names from the deed of their home so as not to own the home they shared with AMC, but again ODDS did not deem this sufficient to correct the licensing violation. ODDS finally agreed to resume payment to SFH for AMC's attendant care only if AMC lived in the apartment attached to Plaintiff Schrader's house instead of in the Schrader's home, or if AMC moved out of the Schrader home altogether.

53.

AMC's guardians requested a reasonable accommodation in the form of allowing AMC to live in the Schrader home. ODDS denied this request without engaging in the interactive process or otherwise determining how such an accommodation would impose an undue hardship on ODDS. Defendant Kronenberg agreed to resume payments to Plaintiff SFH for AMC's hourly attendant care services under the condition that AMC move into the duplex where Plaintiff Schrader had moved only if Plaintiff Schrader moved out of the duplex so that AMC and Plaintiff Schrader were not living together. Plaintiff Schrader agreed to these terms under duress, as it was the only way that AMC could receive the care she needed. This duplex did not have a

roll-in shower, which is necessary for AMC to be able to shower safely. Instead, AMC had to take a bus to the Schrader home three times a week in order to take a shower.

54.

When Covid regulations began, AMC was no longer able to ride the bus to the Schrader home because she was unable to wear a mask (as required per Tri-Met policy) because it caused respiratory distress. AMC's caregivers found the best solution was to give AMC sponge baths over a tarp on the kitchen floor. Plaintiff Schrader requested a reasonable accommodation on AMC's behalf to avoid this humiliating experience by allowing AMC to move back in with Plaintiff Schrader.

55.

ODDS again refused without engaging in the interactive process or determining whether or not this would impose an undue hardship on ODDS.

**AS - <u>Authorized ISP Services Inaccessible to AS</u>**

56.

AS is an individual who needs 336 hours of care per week as determined by her ISP. Between 9/30/21 thru 10/12/21 AS could not access 588 hours of her ISP attendant care services. Because AS could not access her ISP attendant care services, Defendants denied Plaintiffs payment for 588 hours of ISP care that Defendants required Plaintiff to deliver. Defendants required Plaintiff SFH to deliver care according to AS's ISP or face abuse allegations and licensing violations. The compensation Plaintiff SFH should have received for delivering AS's ISP attendant care shall be determined at trial, but shall not exceed $30,000.

57.

**No Notice Provided to AS to Contest the Reduction and Denial of Her Services**

In 2021, AS's ISP indicated she needed 48 hours of care per day. However, Defendants

only approved AS for 20 hours of care per day. AS never received any notice from DHS or

ODDS about this reduction in services.

58.

**AS Denied Prompt Services**

From 9/30/21 through 10/12/21, AS waited for DHS to deliver her ISP services

authorized by DHS but DHS failed to deliver 588 of her ISP hours. This extraordinary delay is a

violation of 42 U.S.C. § 1396a(a)(8), which requires Medicaid services to be delivered promptly.

59.

**AS Denied a Fair Hearing**

AS never received the opportunity for a fair hearing regarding the reduction in services

that occurred in 2021 (the difference between the hours of care in her authorized ISP vs. hours of

care for which DHS made her eligible).

**CW - Authorized ISP Services Inaccessible to CW**

60.

CW is an individual who currently needs 193 hours of care per week as determined by

her ISP. Between 9/29/21 thru 10/20/21 CW could not access 93 hours of her ISP attendant care

services. Because AS could not access her ISP attendant care services, Defendants denied

Plaintiffs payment for 93 hours of ISP care that Defendants required Plaintiff to deliver. Between

9/1/2022 to the present, CW has been unable to access 180 hours of attendant care per month that

is authorized in her ISP. Defendants required Plaintiff SFH to deliver care according to CW's ISP or face abuse allegations and licensing violations. This type of systemic discrimination continues through the present. The additional compensation Plaintiff SFH should have received for this individual shall be determined at trial, but shall not exceed $100,000 plus future compensation while awaiting trial.

61.

**No Notice Provided to CW to Contest the Reduction and Denial of Her Services**

In 2021, CW's ISP indicated she needed 24 hours of care per day. Between 9/29/21 thru 10/20/21 CW was denied access to 93 hours of her ISP attendant care but never received any notice from DHS or ODDS about this reduction and denial of services.

62.

In September of 2022, CW's ISP indicated she needed 24 hours per day plus a second attendant for 180 hours per month. Defendants have denied 180 hours of a second attendant a month as required in CW's ISP but CW has never received any notice from DHS or ODDS about this denial of services.

63.

**CW Denied Prompt Services**

From 9/29/21 thru 10/20/21, and from September 2022 to the present, CW waited and continues to wait for DHS to deliver her ISP services authorized by DHS. This extraordinary delay is a violation of the Medicaid Act which requires Medicaid services to be delivered promptly.

64.

**CW Denied a Fair Hearing**

CW never received a fair hearing regarding the reduction in services that occurred in 2021 (the difference between the hours of care in her authorized ISP vs. hours of care for which DHS made her eligible) nor for the denial of 180 hours of ISP attendant care from September 2022 to the present. This type of systemic discrimination continues through the present. CW was never allowed to submit evidence or interview witnesses.

65.

**CW's Rights Violated Under the Fair Housing Act**

CW currently lives with one of her caregivers who is an employee of Plaintiff SFH. OAR 411-450-0060(6) denies CW the right to live in and enjoy this dwelling of her choice. 42 USC 3604(f)(2)(B) prohibits discrimination against any person in the terms, conditions, or privileges of the rental of a dwelling or provision of services in connection with such dwelling because of a handicap of a person residing in or intending to reside in that dwelling. The implementation of OAR 411-450-0060(6) violated this Federal statute and forces CW to move out of her current home to receive her community living support services from SFH.

**CM - Authorized ISP Services Inaccessible to CM**

66.

CM is an individual who needs 168 hours of care per week as determined by her ISP. Between 9/29/21 thru 10/20/21 CM could not access 107 hours of her ISP attendant care services. Because CM could not access her ISP attendant care services, Defendants denied Plaintiffs payment for 107 hours of ISP care that Defendants required Plaintiff to deliver.

67.

Defendants required Plaintiff SFH to deliver care according to CM's ISP or face abuse allegations and licensing violations. This type of systemic discrimination continues through the present. The compensation Plaintiff SFH should have received for delivering CM's ISP attendant care shall be determined at trial, but shall not exceed $10,000.

68.

**No Notice Provided to CM to Contest the Reduction and Denial of Her Services**

In 2021, CM's ISP indicated she needed 24 hours of care per day. Between 9/29/21 thru 10/20/21 CM needed 528 attendant care hours but ODDS made her eligible for only 421 attendant care hours so she could not access 107 hours of her ISP attendant care. CM never received any notice from DHS or ODDS about this denial of 107 hours of her authorized ISP services.

69.

**CM Denied Prompt Services**

From 9/29/21 through 10/20/21, CM waited for DHS to deliver her ISP services authorized by DHS. This extraordinary delay is a violation of the Medicaid Act which requires Medicaid services to be delivered promptly.

70.

**CM Denied a Fair Hearing**

CM never received notice to access a fair hearing regarding the denial in services that occurred from 9/29/21 through 10/20/21 (the difference between the hours of care in her authorized ISP vs. hours of care for which DHS made her eligible). This type of systemic

discrimination continues through the present. CM was never offered notice that she was entitled to a fair hearing, she was not allowed to submit evidence or interview witnesses.

71.

**CM's Rights Violated Under the Fair Housing Act**

CM currently lives with one of her caregivers who is an employee of Plaintiff SFH. OAR 411-450-0060(6) denies CM the right to live in and enjoy this dwelling of her choice. 42 USC 3604(f)(2)(B) prohibits discrimination against any person in the terms, conditions, or privileges of the rental of a dwelling or provision of services in connection with such dwelling because of a handicap of a person residing in or intending to reside in that dwelling. The implementation of OAR 411-450-0060(6) violated this Federal statute and forces CM to move out of her current home to receive her community living support services from SFH.

72.

In addition to the discriminatory practices listed above, Defendants have also discriminated against disabled individuals who need a second caregiver and choose a single agency provider to deliver the services of both caregivers. Around the beginning of this action, Oregon law reimburses agency providers at a rate of $41.13 per hour for a single caregiver. However, for those disabled individuals that need more than one caregiver, the state of Oregon reimburses an agency provider for the second caregiver at the rate of $33.39, $7.74 dollars per hour less than the first caregiver if both caregivers work for the same agency.

73.

This denies disabled individuals who need two caregivers at the same time the same value of reimbursement that is received by disabled individuals who only need one caregiver (unless the individual hires a second agency for the second caregiver). For example, if one

disabled person needs 10 hours of care per day from a single caregiver, then they will receive $41.13 per hour in value. If another disabled person needs 20 hours of care per day from two caregivers at the same time, that disabled person will only receive $37.26 per hour in value unless they hire a separate agency for their second caregiver. If two agencies each provide one caregiver, only then are both caregivers reimbursed at the same rate.

74.

Plaintiffs are aggrieved by this discrimination because it makes it much harder for agency providers to hire additional caregivers for those who need two caregivers at the same time. Plaintiffs pay these additional caregivers the same rate of pay as other caregivers, but receive less reimbursement. But for this discriminatory practice, Plaintiffs would receive just compensation for the care they deliver to disabled individuals who need two caregivers at the same time.

75.

These allegations set forth a continuing violation of law. Up to the time this action was filed, Defendants were continuing to use of the Assessments System to deny individuals access to their attendant care hours in their ISPs—meaning that those individuals were not receiving the supports necessary to reside in the setting that they chose. See O.R.S. 430.662(1)(a)(A). On information and belief, Defendants have maintained and have not abolished the Failure to Notify Policy of the Assessments System to reduce the attendant care hours available to high-needs individuals in residential settings without providing notice to those individuals or an opportunity to challenge the reduction of attendant care hours.

## CLAIMS FOR RELIEF

76.

Defendants' Assessments System, as applied, withholds Community Living Supports from individuals who choose to live in a Provider Setting. This harms the individuals themselves, who lose the freedom to choose a Provider Setting, which for high-needs individuals means losing the freedom to live independently. Plaintiffs are harmed by suffering fear, anxiety, and emotional distress at the harm caused to I/DD individuals with whom they live and for whom they care (not just in the sense of providing services). Plaintiff Schrader has persevered in spite of the sense that no one else is standing up to the State to defend the rights of the I/DD individuals who are harmed by Defendants' policies. This may also be bolstered by the fact that Schrader would prefer to retire but is not in order to advocate for her clients The Assessments System harms Plaintiffs directly by causing Plaintiffs to lose the companionship of individuals who have chosen to make their home with Plaintiffs and to receive Community Living Supports services from Plaintiffs. The Assessments System, in particular the Failure to Notify Policy, harms Plaintiffs by making the ODDS residential program untenable for the high-needs individuals in Plaintiffs' care. The Assessments System also harms Plaintiffs by requiring them to provide the support and services agreed upon in the ISP but without pay for any support and services beyond the amounts calculated by the Assessments System. Plaintiffs are entitled to recover payment for services rendered under the ISPs of the individuals served by Plaintiffs.

## FIRST CLAIM FOR RELIEF
(Assessments System violates federal law)

77.

Plaintiffs incorporate the allegations of the preceding paragraphs.

78.

Defendants use the Oregon Assessments System in a manner that restricts high-needs I/DD individuals from receiving all the Community Living Supports benefits that are necessary to their health and care and to which they are entitled in their ISP, in conflict with federal laws. *See supra* 29 U.S.C. § 794; 42 U.S.C. § 1396n(k); *id.* § 12132; *see also* 28 C.F.R. § 35.130(d) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."). This prohibition harms Plaintiffs by requiring Plaintiffs either to fail to provide all the support required in the ISP for the high-needs I/DD individuals who choose to receive support services from Plaintiff or to provide services without receiving payment.

79.

On its face, and as applied, the Assessments System violates Medicaid's "free-choice-of-provider requirement," by removing from SFH's clients the right to obtain necessary assistance, much less to select from any person qualified to provide such services. *See Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2003); 42 U.S.C. § 1396a(a)(23). SFH is certified and endorsed to deliver Community Living Supports Services, and but for the Assessments System, the individuals who obtain Community Living Supports Services from

SFH at the level permitted by the Assessments System would obtain additional services from SFH at the level provided in their respective ISPs.

80.

Plaintiffs have suffered economic damages in an amount to be proved at trial, including up to $2,140,000. Plaintiff Schrader has suffered non-economic damages in the amount of $500,000 due to pain, suffering, emotional distress, and inconvenience. Plaintiff Schrader and SFH's employees have also suffered indirectly the harms caused to the I/DD individuals by Defendants' withholding of care. Plaintiffs suffered physical anxiety, fear, and distress in seeing the individuals that they care for denied the supportive care that they needed as set forth in their ISPs. Plaintiffs are entitled to pre-judgment interest on their economic damages, pursuant to ORS 82.010(1)(a), at a rate of 9% simple per annum, beginning from the date Defendants failed to first make payments to Plaintiff for the care individuals needed according to their ISPs.

81.

Plaintiffs are entitled to a declaration that the Assessments System violates federal law, including pre-judgment interest on their economic damages, pursuant to ORS 82.010(1)(a), at a rate of 9% simple per annum, beginning from the date Defendants failed to first make payments to Plaintiff for the care individuals needed according to their ISPs.

**SECOND CLAIM FOR RELIEF**
(Breach of Contract - Assessments System violates individual ISPs)

82.

Plaintiffs incorporate the allegations of the preceding paragraphs.

83.

Defendants' Assessments System prevents high-needs I/DD individuals from receiving all the Community Living Supports benefits in a setting of their choosing, to which they are

entitled in their respective ISP, in conflict with the ISP. The ISP includes an agreement among the individual and ODDS (or its representative such as a services coordinator or personal agent) regarding the individual's right to make an informed choice about where to live and receive services, which services to use, and which available providers to select to deliver those services. ODDS or its representative signs the agreement to "ensure the plan meets [the individual's] current service needs and complies with requirements for the chosen service setting(s) and associated funding."

84.

The ISP reflects not only an agreement by the State of Oregon and Defendants but also carries the force of law as it is created under federal regulation and must comply with those regulations. *See* 42 CFR 441.540 (defining the "person-centered service plan"); 42 CFR 441.555 ("States must provide, or arrange for the provision of, a support system that meets all of the following conditions . . .").

85.

Defendants have breached the ISPs by failing to provide the support and services agreed upon in the ISP and by failing to provide information, counseling, training, and assistance in making any modification to the ISP based on Oregon's Assessments System.

86.

Plaintiffs have been injured by Defendants' breach because Plaintiffs upheld their end of the bargaining, by providing the support and services agreed upon in the ISP, but Defendants refused to pay for it. Plaintiffs are entitled to payment for services rendered under the ISPs of the individuals served by Plaintiffs.

## THIRD CLAIM FOR RELIEF
(Quasi-Contract – Quantum Meruit – Unjust Enrichment)

87.

Plaintiffs incorporate the allegations of the preceding paragraphs.

88.

Defendants' Assessments System prevents high-needs I/DD individuals from receiving all the Community Living Supports benefits in a setting of their choosing, to which they are entitled in their respective ISP, in conflict with the ISP. The ISP obligates care providers to support the individual at the level of attendant care hours stated in the ISP. The ISP the force of law as it is created under federal regulation and care providers must comply with those regulations. *See* 42 CFR 441.540 (defining the "person-centered service plan"); 42 CFR 441.555 (*"States must provide, or arrange for the provision of, a support system that meets all of the following conditions . . ."*); *see also* OAR 411-317-0000(116) ("The ISP is the plan of care for Medicaid purposes.").

89.

Plaintiffs upheld their end of the bargain, by providing the attendant care support hours set forth in the ISP for the I/DD individuals identified herein, but Defendants refused to pay for any care beyond the level dictated by the Assessments System. Defendants are using the Assessments System to deny individuals access to the attendant care hours to which they are entitled in their ISPs.

90.

In the alternative to the existence of a binding contract, Defendants were obligated to provide the level of attendant care set forth in each individual's ISP, by law, acquiescence, estoppel, quantum meruit, or other operation of equity. Defendants were enriched unjustly by

Plaintiffs' sacrifice because Plaintiffs provided the care that Defendants were obligated to provide, and Defendants have refused to pay for it.

91.

Plaintiffs have been injured by Defendants refusal to pay for the level of attendant care services agreed upon in each individual's ISP. Plaintiffs are entitled to payment for services rendered under the ISPs of the individuals served by Plaintiffs.

**FOURTH CLAIM FOR RELIEF**
(42 U.S.C. § 1983 – Violation of Due Process – against individual Defendants only)

92.

Plaintiffs incorporate the allegations of the preceding paragraphs.

93.

Under the Due Process Clause, "[n]o state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law."

94.

On its face, and as applied, the Assessments System imposes costs, contains a penalty, and restricts the right of association for I/DD individuals with high-needs ISPs by *withholding* the necessary care for such individuals to live independently.

95.

On its face, and as applied, the Assessments System also imposes costs, contains a penalty, and restricts the right of association for Plaintiffs by requiring them to provide the support and services agreed upon in the ISP but without pay for any support and services beyond the amounts calculated by the Assessments System. Plaintiffs are entitled to payment for services rendered under the ISPs of the individuals served by Plaintiffs. As applied, the Assessments

System also threatens Plaintiffs' association with individuals receiving Community Living

Support services from Plaintiff SFH and living in a Provider Setting.

96.

On its face, and as applied, the Assessments System violates Medicaid's "free-choice-of-

provider requirement," by removing from SFH's clients the right to obtain necessary assistance

as set forth in their ISPs, or to obtain that assistance from any person qualified to provide such

services. *See Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2003); 42

U.S.C. § 1396a(a)(23). SFH is certified and endorsed to deliver Community Living Supports

Services, and but for the Assessments System, the individuals who obtain Community Living

Supports Services from SFH at the level permitted by the Assessments System would obtain

additional services from SFH at the level provided in their respective ISPs.

97.

At all relevant times, Defendants acted under color of state law when engaged in

rulemaking, promulgating, and enforcing the Assessments System. Specifically, Defendants

Pakseresht, Tenity, and Kronenberg were exercising the authority given to each of them by the

State of Oregon, and their respective actions (and those of their respective delegees in ODDS)

were taken with the appearance that the State of Oregon authorized them.

98.

Defendant Pakseresht's official conduct as the director of DHS, in administering and

enforcing the Assessments System, has deprived Plaintiffs and Plaintiffs' clients of their rights

under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as

described above.

99.

Plaintiffs are entitled to (1) a declaration that the Assessments System is unconstitutional, on its face and/or as applied, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and (2) prospective injunctive relief, prohibiting Defendants from continuing to administer and enforce the Assessments System in a manner inconsistent with individuals ISPs.

100.

Plaintiffs are entitled to damages against the individual Defendants, including in the amount of payment for services rendered under individual ISPs, but not reimbursed due to Defendants' application of the Assessments System. The amount of these damages shall be determined at trial but shall not exceed $5,000,000. Plaintiff Schrader has also suffered damages due to pain, suffering, emotional distress, and inconvenience caused by Defendants application of the Assessments System to withhold necessary care from I/DD individuals with high-needs ISPs to whom Schrader is committed and for whom Schrader has cared with no small sacrifice.

**FIFTH CLAIM FOR RELIEF**
(Failure to make a reasonable accommodation under the FHA)

101.

Defendants' Assessments System, as applied, withholds Community Living Supports from individuals who choose to live in a Provider Setting. This harms the individuals themselves, who lose the freedom to choose a Provider Setting, which for high-needs individuals means losing the freedom to live independently. Plaintiffs are harmed by suffering fear, anxiety, and emotional distress at the harm caused to I/DD individuals with whom they live and for whom they care (not just in the sense of providing services). The Assessments System harms Plaintiffs directly by causing Plaintiffs to lose the companionship of individuals who have chosen to make

their home with Plaintiffs and to receive Community Living Supports services from Plaintiffs.
The Assessments System also harms Plaintiffs by requiring them to provide the support and
services agreed upon in the ISP but without pay for any support and services beyond the amounts
calculated by the Assessments System. Plaintiffs are entitled to recover payment for services
rendered under the ISPs of the individuals served by Plaintiffs.

102.

A reasonable accommodation to Defendants' Final Rule would be to allow I/DD
individuals to receive Community Living Supports care in a nonresidential setting of their
choosing, including a Provider Setting. A reasonable accommodation to Defendants' Proposed
Rule would be to allow the individuals who have chosen to make their home in a house of
Plaintiff Schrader or of an employee of Plaintiff SFH and to receive Community Living Supports
services from Plaintiff SFH to continue to live in their respective homes and receive services
from a Community Living Supports agency of their choosing. Plaintiffs made an
accommodations request, but ODDS did not grant the request or even apparently conduct a
review of the accommodations request. Failure to allow such a reasonable accommodation
constitutes discrimination under federal law, including under the Fair Housing Act.

103.

A reasonable accommodation to the Final Rule would be to allow severely disabled
individuals to receive community living support care and reside with their caregivers in order for
them to have an equal opportunity to use and enjoy a dwelling of their choice. Reasonable
accommodations are required under the Fair Housing Act and failure to allow such an
accommodation constitutes discrimination. *See e.g.* 42 USC 3604(f)(3)(B).

104.

Plaintiffs will suffer economic damages if the Final Rule is allowed to take effect without this reasonable accommodation. The amount of these damages shall be determined at trial, but shall not exceed $5,000,000. Plaintiff Schrader will suffer non-economic damages in the amount of $500,000 due to pain, suffering, emotional distress, and inconvenience.

105.

Refusing to allow disabled persons to reside with their caregivers discriminates against Plaintiffs because it alters the terms, conditions, or privileges of the rental of Plaintiff Schrader's dwelling to TH, based on TH's disabilities.

106.

Plaintiffs will suffer economic damages if TH is not free to live where he chooses. The amount of these damages shall be determined at trial, but shall not exceed $5,000,000. Plaintiff Schrader will suffer non-economic damages in the amount of $500,000 due to pain, suffering, emotional distress, and inconvenience.

**SIXTH CLAIM FOR RELIEF**
(Disability Discrimination 42 USC 12132 – against all Defendants)

107.

Plaintiffs incorporate the allegations of the preceding paragraphs.

108.

The Assessments System discriminates against disabled individuals by reason of their disability by denying high-needs I/DD individuals who are otherwise eligible for Community Living Supports the support that is necessary for them to live in the manner they choose to live, as set forth in their ISP.

109.

The ADA protects disabled individuals from denial of eligibility for services or programs because denial of eligibility means denial of access to the supports that are necessary for the disabled person to function in society as a person without disabilities. "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S. Code § 12132

110.

Defendants have used the Assessments System to deny access of individuals, including those described herein, to the attendant care hours provided for them in their individual ISPs. The Assessments System caps out at a maximum number of attendant care hours and thus fails to accommodate individuals with high-needs ISPs.

111.

The restrictions of the Assessments System are not imposed on individuals who are less disabled than the high-needs I/DD individuals that Plaintiffs serve. Therefore, the restrictions imposed by the Assessment System are imposed *on account of the individual's disability* and constituted discrimination on the basis of disability.

112.

Providing some disabled individuals with a certain value of care that is less than another disabled individual's due to the nature of their disability violates Title II of the Americans with Disabilities Act.

113.

The Assessments System harms the individuals themselves, who are deprived of necessary care. The Assessments System also harms the individuals themselves by taking away the freedom to choose a Provider Setting, which for high-needs individuals means losing the freedom to live independently. Plaintiffs are harmed by suffering fear, anxiety, and emotional distress at the harm caused to I/DD individuals with whom they live and for whom they care (not just in the sense of providing services). Plaintiff Schrader has experienced emotional anguish from ODDS denying these individuals their civil rights and prevent them from accessing the attendant care services that would enable them to participate in society. The Assessments System also harms Plaintiffs directly by causing Plaintiffs to lose the companionship of individuals who have chosen to make their home with Plaintiffs and to receive Community Living Supports services from Plaintiffs. The Assessments System also harms Plaintiffs by requiring them to provide the support and services agreed upon in the ISP but without pay for any support and services beyond the amounts calculated by the Assessments System. Plaintiffs are entitled to recover damages in the form of un-reimbursed services rendered under the ISPs of the individuals served by Plaintiffs, with pre-judgment interest.

114.

Plaintiffs are entitled to a declaration that the Assessments System, on its face and/or as applied, discriminates against the high-needs I/DD individuals served by Plaintiffs and discriminates against Plaintiffs on account the high needs of the individuals that Plaintiffs serve. Plaintiffs have no adequate remedy at law for this discrimination and are entitled to an injunction that Defendants may not use the Assessments System, on its face and/or as applied, to deny services to I/DD individuals or to deny the choice of a Provider Setting by I/DD individuals.

**SEVENTH CLAIM FOR RELIEF**
(Retaliation 42 U.S.C. § 12203 – against all Defendants)

115.

Plaintiffs incorporate the allegations of the preceding paragraphs.

116.

Federal law, including but not limited to the Fair Housing Act and the Medicaid Act, prohibits retaliatory treatment in the administration of federally funded programs. "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. §3617. "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203.

117.

Plaintiffs have advocated on the behalf of disabled individuals by challenging the use of the Assessments System to deprive high-needs I/DD individuals of necessary care, including AMC and other individuals as alleged herein. This advocacy is protected speech under the First Amendment to the U.S. Constitution. This advocacy is also protected from retaliation by statute because it opposes an unlawful act of Defendants, namely the use of Oregon's Assessments System to deny necessary services to high-needs I/DD individuals. 42 U.S.C. § 12203.

118.

Defendants retaliated against Plaintiffs in response to Plaintiff's advocacy on the behalf of disabled individuals. For example, Defendants Tenity and Kronenberg acting on behalf of

ODDS retaliated in October 2019 against Plaintiffs' advocacy for AMC, by refusing to pay for any services delivered by Plaintiffs to AMC if AMC was living in Schrader's home and by not providing any alternative setting for AMC. This action removing from individuals the freedom to choose to receive Community Living Supports in a Provider Setting, *contrary* to ODDS's statutory mandate, including ORS 427.007, and contrary to the federal Integration Mandate. This action also denied to AMC any continuity of services and support. *See* 42 U.S.C. 1396n(k)(1)(B)(ii).

119.

Defendants' actions, including promulgating and enforcing the Final Rule, have harmed Plaintiffs because the Final Rule threatens to deny reimbursement for Community Living Supports service hours and/or issue a licensing violation against Plaintiffs if Plaintiffs continue to honor the self-determining choices of the I/DD individuals who have chosen to make their home with Plaintiff Schrader or with an employee of Plaintiff SFH and to receive Community Living Supports services from Plaintiff SFH.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

- A money award judgment entered against Defendants in an amount to be determined at trial, including for example,

    - $2,180,000 in past economic damages;

    - $5,000,000 in future economic damages during the time that OAR 411-450-0060(6) is allowed to remain in effect;

- $240,000 in future economic damages during the time that Defendants reimburse a second caregiver at a reduced rate.

- $755,000 in non-economic damages.

- Pre-judgment interest on Plaintiffs' past economic damages at a rate of 9% simple per annum.

- Declaratory relief stating that the Assessments System, on its face and as applied, fails to provide the amount of care a disabled person needs according to their ISP is a violation of Title II of the ADA and 42 USC. 1396n(k)(3)(B).

- Declaratory relief stating that Defendants, including by the Assessments System, violated 42 USC 1396n(k)(3)(B), Title II of the ADA and RA by refusing to compensate Plaintiffs for the care they provided to disabled individuals based on their ISP.

- A permanent injunction prohibiting the State of Oregon from using the Assessments System in a manner that conflicts with a disabled person's ISP when determining the amount of care needed to accomplish ADLs, IADLs, and health-related tasks, as determined by their ISP.

- A permanent injunction prohibiting Defendants from implementing the Final Rule or otherwise restricting individuals from choosing a Provider Setting.

- An order requiring Defendants to issue a Notice of Planned Action and allowing opportunity for a fair hearing for any reduction, change or denial of services, whether this change takes place at the time of transfer between two services or occurs while an individual resides in a 24-hour residential facility.

- An order requiring Defendants to implement additional training and procedures for all relevant employees in the areas of: ADA reasonable accommodations, access to government services and programs required under the ADA, and the appropriate requirements necessary to provide disabled individuals the amount of care required under federal Medicaid laws and regulations, regardless of the severity of an individual's disabilities.

- Plaintiff's reasonable costs and attorney's fees associated with bringing this action, pursuant to 42 USC 12205, and/or 42 USC 3613(c)(2), and/or 29 USC 794a(a).

- Any and all other relief the Court deems just and reasonable under the circumstances.


DATED:  January 23, 2024                        STOEL RIVES LLP


                                                */s/ Elliott J. Williams*
                                                ELLIOTT J. WILLIAMS
                                                elliott.williams@stoel.com
                                                *Attorneys for Plaintiffs*